# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| J.P. MORGAN TRUST COMPANY OF DELAWARE, TRUSTEE OF THE FISHER 2006 TRUST F/B/O HADLEY FISHER U/A DTD 2/16/2006, | ) ) ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | C.A. No. 12894-VCL |
| HADLEY FISHER and MICHAEL FISHER, | ) ) | |
| Respondents. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: November 19, 2019
Date Decided: December 5, 2019

Richard L. Renck, Oderah C. Nwaeze, Jocelyn M. Borowsky, DUANE MORRIS LLP, Wilmington, Delaware; *Counsel for Petitioner.*

Jeffrey S. Goddess, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Michael H. Friedman, KURZMAN EISENBERG CORBIN & LEVER, LLP, White Plains, New York; *Counsel for Hadley Fisher.*

Christopher P. Simon, Kevin S. Mann, CROSS & SIMON LLC, *Guardian Ad Litem for Michael Fisher and the interests of other minor and unborn issue of Hadley Fisher.*

**LASTER, V.C.**

A trustee sued the trust's beneficiaries seeking a broad declaration that the trustee had acted properly in all respects. During discovery, the trustee invoked the attorney-client privilege for otherwise relevant and responsive documents. The beneficiaries moved to compel production, relying on *Riggs National Bank of Washington, D.C. v. Zimmer*, 355 A.2d 709 (Del. Ch. 1976).

The beneficiaries have made the showing necessary under *Riggs* to obtain production. Contrary to the trustee's position, *Riggs* remains good law and has not been abrogated by statute. The motion to compel is therefore granted.

## I. FACTUAL BACKGROUND

The facts are drawn from the parties' submissions in connection with the motion to compel. Given the procedural posture, this decision does not make findings of fact. It rather describes how matters appear at this stage of the case for purposes of this ruling.

### A. The Creation Of The Trust

In February 2006, with his health deteriorating, Richard Fisher entered into an option agreement with a newly formed Delaware limited liability company named RLF Assets, LLC (the "Company"). Upon Richard's death, the option would give the Company the right to purchase Richard's ownership interest in Fisher Brothers, a real estate business valued in the hundreds of millions of dollars (the "Fisher Brothers Option").[1]

---

[1] To avoid confusion, this decision refers to members of the Fisher family by their first names.

The members of the Company were Richard's three children: Winston, Hadley, and Alexandra. Richard gave Winston a full member interest that carried both voting and economic rights. The LLC agreement designated Winston as the Managing Member of the Company with sole authority to conduct its business and affairs. Richard created trusts for Hadley and Alexandra. Each trust received a special member interest that did not carry any voting rights and initially did not have any economic rights. As special members, the trusts did not have any authority over the Company's business or affairs.

If Winston caused the Company to exercise the Fisher Brothers Option, then the Company would begin making distributions to the special members. During each of the first ten years after the exercise of the Fisher Brothers Option, the Company would distribute at least $600,000 to each special member and, if sufficient net cash flow was available, up to $1,200,000. Beginning in the eleventh year after exercise, the minimum distribution would increase to $700,000 and the maximum to $1,400,000. Any remaining net cash flow would go to Winston.

The exercise of the Fisher Brothers Option would also give the Company the right to acquire the special member interests after ten years (the "Special Member Buyout"). The LLC agreement set the purchase price for each special member interest at $10 million.[2]

---

[2] This description simplifies a more complex structure that included three additional buyout windows and a formula for adjusting the buyout price. Because Winston triggered the Special Member Buyout at the ten-year mark, during the first buyout window, the complexities are not relevant to this decision.

Soon after executing these documents, Richard died. Shortly thereafter, Winston exercised the Fisher Brothers Option.

**B.      J.P. Morgan Becomes Successor Trustee.**

After Richard's death, disputes arose among his widow, his children, and the administrators of his estate. In March 2010, the parties settled. As part of the settlement, the original trustees for Hadley's trust resigned. Petitioner J.P. Morgan Trust Company of Delaware took over as the successor trustee.

From the outset of its service as trustee, J.P. Morgan hoped to recast Hadley's trust as a directed trust in which Hadley would act as the investment advisor and J.P. Morgan's duties would be limited to following his directives and performing administrative functions. Hadley never agreed to the amendments. As a result, J.P. Morgan has all of the duties of a traditional common law trustee, except to the extent modified by the terms of the trust agreement and Delaware statutory law.

**C.      The Special Member Buyout**

In May 2016, Winston initiated the process for the Special Member Buyout. On behalf of Hadley's trust, J.P. Morgan engaged in discussions with Winston. An attorney from Duane Morris LLP represented the trust and conducted the discussions.

In October 2016, Winston offered two alternatives to the contractual mechanism: either a cash purchase of the trust's special member interest for $11.5 million or an exchange of the special member interest for a pool of securities that Winston would select. Both would generate a significant tax burden for the trust. Hadley asked J.P. Morgan to propose a third alternative: a tax-advantaged distribution of real estate that would be held

3

through a special purpose entity. In an internal email, J.P. Morgan described that alternative as "not something that is acceptable to us" and declined to pursue it. Dkt. 80 Ex. I at '375.

On November 1, 2016, Hadley threatened to sue J.P. Morgan if it accepted either of Winston's proposals. *See id.* Ex. J ("He essentially said he will sue if we take one of the deals on the table. He wants us to arbitrate [against Winston]."). Later that month, J.P. Morgan accepted the cash proposal.

## D.    This Litigation

On November 4, 2016, three days after accepting Winston's proposal, J.P. Morgan filed this action against Hadley and his minor son, Michael Fisher, who is a contingent beneficiary of Hadley's trust. J.P. Morgan's petition seeks an expansive declaratory judgment that it complied with its legal and equitable duties in all respects:

> Petitioner [J.P. Morgan] therefore seeks a declaration from this Court that the Petitioner did not abuse its discretion or otherwise breach its duty with respect to any of the conduct described in this Petition, including, but not limited to, its acts or omissions with respect to the Buyout, or with respect to its decision not to pursue a claim against Winston or any of the Co-Trustees for their acts or omissions related to the Estate Settlement, RLF Agreement or ratification of the Operating Agreement including the Buyout Clause.

Dkt. 10 ¶ 64.

Hadley contends that J.P. Morgan should have disputed Winston's ability to trigger the Special Member Buyout. Hadley maintains that Winston faced a conflict of interest because he was both a partner in Fisher Brothers and the sole manager of the Company. Hadley argues that in his latter capacity, Winston owed fiduciary duties to the Company and all of its members, including Hadley's trust. Hadley believes that a loyal trustee would have raised Winston's conflict, disputed whether the Special Member Buyout complied

4

with the Company's LLC agreement, and potentially commenced an arbitration against Winston under the LLC agreement.

Hadley believes that J.P. Morgan gave in to Winston and accepted the cash alternative because of its own conflicts of interest. First, J.P. Morgan had financial incentives to cooperate with Winston, because he and Fisher Brothers provide the bank with substantial revenue. Second, J.P. Morgan had long wanted to exit from its role as a common law trustee responsible for a non-diversified interest in a closely held business, and the cash alternative would achieve that goal. Third, the cash alternative would generate a pool of investable funds that J.P. Morgan could manage, creating a stream of future revenue for the bank.

In discovery, Hadley has developed some evidence to support his theory:

- In a memorandum from April 2010 addressing whether J.P. Morgan should accept the role of trustee, J.P. Morgan noted that although the fee for Hadley's trust was only $7,500 annually, "[t]he Executive Wealth Group expects to earn around $1,000,000 from the Fisher family relationship in 2010." Dkt. 80 Ex. A at '124.

- In an October 2012 email exchange in which J.P. Morgan considered withdrawing from its role as trustee, a J.P. Morgan representative noted, "The critical decision is if [the relationship manager] thinks JPM resignation will jeopardize his relationship with Fisher Brothers in any way." *Id.* at '495.

- In an April 2014 email exchange, a J.P. Morgan representative described Hadley's trust as something that J.P. Morgan "really should find a way to exit . . . ." *Id.* at '671.

- In a November 2014 email exchange, a J.P. Morgan representative described Hadley's trust as "a problem child we have been trying to find a way out of for quite some time." Dkt. 84 Ex. E at '761.

- In another November 2014 email exchange, J.P. Morgan representatives debated whether the bank should resign. One representative asked whether J.P. Morgan wanted "to stir the pot again" given that "the brothers are clients of the bank." *Id.* at

5

'760. Another representative confirmed that "the brothers are big clients of the bank." *Id.*

In its opposition to the motion to compel, J.P. Morgan conceded that it considered its client relationship with the Fisher family when deciding whether to continue as the trustee for Hadley's trust. *See* Dkt. 84 at 7 n.4.

**E.      The Discovery Dispute**

In this litigation, Hadley asked for documents relating to the Special Member Buyout and J.P. Morgan's acceptance of the cash alternative. J.P. Morgan produced some documents, but withheld others. J.P. Morgan's privilege log identified the attorney-client privilege as the basis for withholding 570 documents. J.P. Morgan did not rely on the work product doctrine to withhold any of these documents.

As reflected on its privilege log, J.P. Morgan representatives began communicating with in-house counsel almost immediately after Winston said he was triggering the Special Member Buyout. Within the same month, J.P. Morgan began communicating with Duane Morris, who represented the trust in discussions with Winston.

The descriptions on JP Morgan's privilege log indicate that counsel was performing work on behalf of the trust and providing advice in connection with the Special Member Buyout. JP Morgan's log used a virtually identical description for 506 entries, identifying each as a "[c]onfidential communication reflecting request for and provision of legal advice regarding the Buyout Options." Dkt. 80 Ex. C. Eighty of these entries related to the tax implications of the Special Member Buyout for the trust, for which J.P. Morgan added the description "and their tax implications." *Id.* Thirty-one entries referred to claims against

6

Winston, such as "evaluation of self-dealing claims against Winston Fisher." *Id.* Still other descriptions identify documents that concern "Trust administration, the Trust's finances and the Trust's investment decisions." *Id.*

J.P. Morgan has produced email strings with in-house counsel and with Duane Morris in which the bank redacted some communications but not others. *See id.* Exs. F, G, & H. The court reviewed the redacted portions *in camera.* The redacted portions relate to the same subject matter and have the same tenor as the unredacted portions.

For most of the Duane Morris engagement, J.P. Morgan planned to pay Duane Morris out of the trust corpus. *See id.* Ex. L, Ex. M at '973, Ex. N. At some point after October 2016, J.P. Morgan decided to pay Duane Morris with its own funds.

## II. LEGAL ANALYSIS

Hadley moved to compel production of the documents for which J.P. Morgan invoked the attorney-client privilege. He only seeks documents created before November 1, 2016, when he threatened litigation.

### A. Relevant Legal Principles

Delaware Rule of Evidence 502(b) sets forth the basic requirements for invoking the attorney-client privilege.

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, (2) between the lawyer and the lawyer's representative, (3) by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the

7

client, or (5) among lawyers and their representatives representing the same client.

D.R.E. 502(b).

Even when those requirements are met, the privilege "is not absolute." *Morris v. Spectra Energy P'rs (DE) GP*, 2018 WL 2095241, at *1 (Del. Ch. May 7, 2018). Rule 502(d) contains a non-exclusive list of six exceptions:

> (1) *Furtherance of crime or fraud*. If the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud;
>
> (2) *Claimants through same deceased client.* As to a communication relevant to an issue between parties who claim through the same deceased client, regardless of whether the claims are by testate or intestate succession or by inter vivos transaction;
>
> (3) *Breach of duty by a lawyer or client.* As to a communication relevant to an issue of breach of duty by the lawyer to the client or by the client to the lawyer;
>
> (4) *Accusations against a lawyer.* As to a communication necessary for a lawyer to defend in a legal proceeding an accusation that the lawyer assisted the client in criminal or fraudulent conduct;
>
> (5) *Document attested by a lawyer.* As to a communication relevant to an issue concerning an attested document to which the lawyer is an attesting witness; or
>
> (6) *Joint clients.* As to a communication relevant to a matter of common interest between or among 2 or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between or among any of the clients.

D.R.E. 502(d). Other exceptions are recognized by common law. *See Mennen v. Wilm. Tr. Co.*, 2013 WL 4083852, at *3 (Del. Ch. July 25, 2013) (rejecting argument that exceptions in Rule 502(d) are exclusive); *see also Buttonwood Tree Value P'rs v. R.L. Polk & Co,*

*Inc.*, 2018 WL 346036, at *2 (Del. Ch. Jan. 10, 2018) (noting that Rule 502(d) codifies "some" of the exceptions); *Morris*, 2018 WL 2095241, at *1 (same).

One long-recognized exception authorizes beneficiaries of a trust to gain access to a trustee's communications with counsel. The leading decision is *Riggs*, where the beneficiaries of a trust sued the trustees "for alleged breaches of the trust in regard to certain tax matters." 355 A.3d at 709. A year earlier, the trustees had hired counsel "for the purpose of securing a legal opinion in connection with the trustees' pending petition for instructions and particularly in anticipation of potential tax litigation on behalf of the trust with the State of Delaware, Division of Revenue." *Id.* Counsel prepared a memorandum analyzing the issues. When the beneficiaries later filed a claim to surcharge the trustees, they sought the memorandum in discovery.

The court conducted a two-step analysis to determine whether the memorandum should be produced. The court initially considered whether the trustees had retained counsel to represent the trust and provide advice that would advance the interests of the trust and its beneficiaries, or whether the trustees had retained counsel to protect their own interests, in anticipation of litigation in which the trustees would be defendants. *Id.* at 711–12. To answer this question, the court examined the "the purpose for which [the memorandum] was prepared, and the party or parties for whose benefit it was procured, in relation to what litigation was then pending or threatened." *Id.* at 711.

The court found that the memorandum "was prepared ultimately for the benefit of the beneficiaries of the trust and [n]ot for the purpose of the trustees' own defense in any

litigation against themselves." *Id.* In reaching this conclusion, the court cited the nature of the legal issues and litigation then facing the trustees and the trust.

> At the time [the memorandum] was prepared the litigation which was then pending was a petition for instructions, the very nature of which normally indicates that the trustees were not implicated in any way. There was also the possibility of potential litigation against the State of Delaware, Division of Revenue. Both of these actions suggest that the legal assistance to the trustees would be rendered only in their service to the beneficiaries.

*Id.* The trustees had not faced any proceedings that would have caused them to seek legal advice to protect their own interests. There was also no evidence of threatened litigation against the trustees, and no indication that the purpose of the memorandum "was defensive on the trustees' part." *Id.*

The *Riggs* court also noted that the trustee had paid the law firm's fees out of trust assets, which the court regarded as "a strong indication of precisely who the real clients were" and consequently "a significant factor" that weighed in favor of access. *Id.* at 712. The payment was not itself dispositive, but rather evidenced counsel's role.

Based on this showing, the court found that "the ultimate or real clients were the beneficiaries of the trust . . . ." *Id.* at 711. The court observed that under those circumstances, "the trustee, . . . in his capacity as a fiduciary, was, or at least should have been, acting only on behalf of the beneficiaries in administering the trust." *Id.* at 711.

Having concluded that the trustees secured the memorandum as trustees on behalf of the trust, the court moved to the second step in the inquiry: whether "the beneficiaries ought to be permitted to inspect documents prepared by an attorney on their behalf though completed at the request of the trustee or whether the privileges asserted are of such

10

compelling importance as to allow the trustee to withhold the documents . . . ." *Id.* at 712. The court noted that treatise writers favored production, quoting one author who stated flatly: "'A beneficiary is entitled to inspect opinions of counsel procured by the trustee to guide him in the administration of the trust.'" *Id.* (quoting 2 *Scott on Trusts* § 173 (3d ed. 1967)). The court also regarded production as justified because "the trustees have substantive fiduciary duties to the beneficiaries" and were obligated "to attend to the disposition and maintenance of the trust property so that it may be enjoyed by the beneficiaries . . . ." *Id.* Continuing, the court explained that "[i]n order for the beneficiaries to hold the trustee to the proper standards of care and honesty and procure for themselves the benefits to which they are entitled, their knowledge of the affairs and mechanics of the trust management is crucial." *Id.* Given this interest, the court found a "compelling" case for permitting the beneficiary to access legal advice that the trustee had obtained for purposes of administering the trust, as opposed to legal advice procured at the trustee's "[o]wn expense and for his [o]wn protection . . . ." *Id.* The court observed that this outcome was consistent with the rule under English law, which had stood "for over one hundred years." *Id.* at 712.

The court finally considered the important policies served by the attorney-client privilege and weighed them against the fiduciary relationship between the trustee and the beneficiaries. The court concluded that on balance, public policy called for protecting the fiduciary relationship, even if that meant encroaching on the attorney-client privilege.

> As a representative for the beneficiaries of the trust which he is administering, the trustee is not the real client in the sense that [h]e is personally being served. And, the beneficiaries are not simply incidental

11

beneficiaries who [c]hance to gain from the professional services rendered. The very intention of the communication is to aid the beneficiaries. The trustees here cannot subordinate the fiduciary obligations owed to the beneficiaries to their own private interests under the guise of attorney-client privilege. The policy of preserving the full disclosure necessary in the trustee-beneficiary relationship is here ultimately more important than the protection of the trustees' confidence in the attorney for the trust.

*Id.* at 713–14.

Subsequent Delaware decisions have followed *Riggs*.[3] Consistent with *Riggs*, the *Restatement (Third) of Trusts* summarizes the law as follows: A trustee "ordinarily has a duty promptly to respond to the request of any beneficiary for information concerning the trust and its administration, and to permit beneficiaries on a reasonable basis to inspect trust documents, records, and property holdings." *Restatement (Third) of Trusts* § 82(2) (Am. Law Inst. 2007). The right to information includes access to

legal consultations and advice obtained in the trustee's fiduciary capacity concerning decisions or actions to be taken in the course of administering the trust. Communications of this latter type are subject to the general principle entitling a beneficiary to information that is reasonably necessary to the prevention or redress of a breach of trust or otherwise to the enforcement of the beneficiary's rights under the trust.

---

[3] *Compare Mennen*, 2013 WL 4083852, at *7, 10 (granting in part motion to compel seeking production under *Riggs*), *and In re Heizer Corp.*, 1987 WL 19560, at *2–3 (Del. Ch. Nov. 9, 1987) (ordering production under *Riggs*), *with N.K.S. Distribs., Inc. v. Tigani*, 2010 WL 2011603, at *1 (Del. Ch. May 7, 2010) (declining to order production of documents "prepared on behalf of a trustee in preparation for litigation between a successor beneficiary and the trustee"), *and In re Estate of Calloway*, 1996 WL 361504, at *2–3 (Del. Ch. June 19, 1996) (denying motion to compel production of memorandum prepared to analyze defenses to claim).

*Id.* § 82 cmt. f. By contrast, "[a] trustee is privileged to refrain from disclosing to beneficiaries or co-trustees opinions obtained from, and other communications with, counsel retained for the trustee's personal protection in the course, or in anticipation, of litigation (e.g., for surcharge or removal)." *Id.*

**B.** *Riggs* **Applies To The Current Case.**

The party seeking to invoke an exception to the attorney-client privilege bears the burden of showing that it applies. *Mennen*, 2013 WL 4083852, at \*4. In this case, Hadley has shown that he is entitled to the privileged documents under *Riggs*.

The first question is whether the documents Hadley seeks involve advice J.P. Morgan obtained about how to carry out its duties to the trust and its beneficiaries. If so, then they are subject to production. By contrast, Hadley is not entitled to advice that J.P. Morgan obtained for its own defense against anticipated, threatened, or asserted claims. *See Riggs*, 355 A.2d at 712; *Restatement (Third) of Trusts* § 82 (Am. Law Inst. 2007).

The record on the motion establishes that J.P. Morgan consulted with in-house counsel and with Duane Morris to obtain advice about how to carry out its duties to the trust and its beneficiaries. After Winston said he was triggering the Special Member Buyout, J.P. Morgan began consulting with counsel about the implications of that act. The Special Member Buyout affected the sole asset of Hadley's trust—its special member interest—so advice regarding the implications of the Special Member Buyout affected core concerns of the trust and its beneficiaries. The descriptions on J.P. Morgan's privilege log support this conclusion; they refer generally to advice regarding the Special Member Buyout, its tax implications, and claims against Winston. The Special Member Buyout only

13

would have tax implications for the trust, not for J.P. Morgan. Any claims against Winston likewise would be assets of the trust, not J.P. Morgan. Thus, J.P. Morgan was obtaining advice in its role as trustee about matters pertaining to the trust.

The few emails that J.P. Morgan has produced indicate that J.P. Morgan obtained advice on behalf of Hadley's trust. In one email, a Duane Morris attorney explained that her litigation partner had "consulted . . . on the pros and cons with respect to responding to the notice letter." Dkt. 80 Ex. L. The notice letter was directed to the trust, and the question of how to respond was a matter for the trust to address. In another, a J.P. Morgan trust officer asked about positions that the trust would take in negotiations with Winston. *See id.* Ex. F at '125. Yet another discusses J.P. Morgan's evaluation of the options that Winston was offering the trust. *See id.* Ex. G. Both communications evidence J.P. Morgan acting on behalf of the trust.

Most tellingly, a Duane Morris attorney represented Hadley's trust in the negotiations with Winston. The fact that Duane Morris spoke for the trust demonstrates that Duane Morris was acting on the trust's behalf.

As to these items, nothing in the record suggests that J.P. Morgan consulted with counsel about its own interests or defensively against potential claims. Any uncertainty about the nature of the advice provided in these documents arises from the repetitive and cryptic descriptions on J.P. Morgan's privilege log. J.P. Morgan possesses the actual documents and was in a position to describe them accurately. If J.P. Morgan could have characterized them as relating to J.P. Morgan's own defense, then J.P. Morgan doubtless would have done so.

Other contextual factors likewise support production. Hadley has raised claims about the divided loyalties of a trustee that find preliminary support in the evidentiary record. Hadley does not appear to have any other means of accessing the information, and obtaining access is necessary to evaluate what J.P. Morgan was doing. "[F]or the beneficiaries to hold the trustee to the proper standards of care and honesty and procure for themselves the benefits to which they are entitled, their knowledge of the affairs and mechanics of the trust management is crucial." *Riggs*, 355 A.2d at 712. J.P. Morgan also appears to have invoked privilege in a selective manner by producing certain communications in email chains while withholding others. Based on the court's *in camera* review, there was no basis for J.P. Morgan to make a partial production. Without obtaining access to the remaining materials, Hadley faces the risk that J.P. Morgan produced only material that it deems favorable, while withholding information that might cast its conduct in a different light. Hadley also is not blindly fishing for information. He has identified specific communications on J.P. Morgan's privilege log. He is not seeking communications that post-date November 1, 2016, the point at which he threatened litigation against the trustee. He has not sought any advice for which J.P. Morgan has invoked the work product doctrine.

As to these documents, the beneficiaries' interest in trust affairs and the trustee's duty to provide information outweighs the trustee's interest in keeping its communications with counsel secret. Hadley is entitled to production of these documents under *Riggs.*

There are thirteen items on J.P. Morgan's privilege log that warrant *in camera* review. The descriptions of these items include the tagline "potential litigation with

15

Respondent Hadley Fisher." *See id.* Ex. C. J.P. Morgan did not focus on these items in its briefing, opting instead to defend its claims of privilege globally using expansive arguments that this decision rejects.

The descriptions of the thirteen items refer principally to discussions of the Special Member Buyout, Winston's alleged self-dealing, or administration of the trust. Under *Riggs*, without more, J.P. Morgan would have to produce these items. The descriptions for these items then provide a little bit more in the form of the conclusory reference to "potential litigation with Respondent Hadley Fisher." Although J.P. Morgan's repetitive and otherwise unsupported use of this conclusory reference could be deemed insufficient to support a claim of privilege, the court will review the thirteen items *in camera*.

## C. The Scope Of Section 3333

Perhaps anticipating that *Riggs* requires production, J.P. Morgan claims that in 2015, "the General Assembly rendered *Riggs* . . . inapplicable by adding subsection (a) to 12 *Del. C.* § 3333." Dkt. 84 at 3. According to J.P. Morgan, *Riggs* "has been superseded by statute." *Id.* at 8. That is incorrect.[4]

In 2015, the General Assembly amended Section 3333 of title 10, titled "Retention of counsel by fiduciary," as follows:

> (a) In the case of a fiduciary that retains counsel in connection with any matter whether or not related to any claim that has been or might be asserted against the fiduciary and pays such counsel's fees and related

---

[4] This is the second time that a trustee has argued that a statutory amendment that did not reference *Riggs* nevertheless overruled the fiduciary-exception. This court previously rejected similar arguments in *Mennen*, 2013 WL 4083852, at *3.

expenses entirely from such fiduciary's own funds, any communications with such counsel shall be deemed to be within the attorney-client privilege.

(b) Except as otherwise provided in the governing instrument, a fiduciary may retain counsel in connection with any matter that is or that might reasonably be believed to be one that will become the subject of or related to a claim claim that has been or might be asserted against the fiduciary, and the payment of counsel fees and related expenses from the fund with respect to which the fiduciary acts as such shall not cause the fiduciary to waive or to be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the fiduciary in the performance of fiduciary duties.

80 Del. Laws ch. 153 (2015) (amending 12 *Del. C.* § 3333).

Nothing about the amendment overruled *Riggs*. Section 3333(a) codified the common law principle that a fiduciary can retain counsel and invoke the attorney-client privilege for the advice it obtains. But that is only the first step of the privilege analysis. The next question is whether an exception to privilege applies, either as set forth in Delaware Rule of Evidence 502(d) or under the common law. Section 3333(a) does not address exceptions to the attorney-client privilege. If J.P. Morgan's reading of the statute were correct, then Section 3333(a) would not only have overruled *Riggs*, but also have eliminated the crime-fraud exception, the joint-client exception, the at-issue exception, and all the rest. That is not a reasonable reading of the statute.

Sections 3333(a) and 3333(b) instead address two narrower issues: (i) the degree to which the source of payment affects the trustee's ability to maintain privilege and (ii) the extent to which a claim must be pending or threatened for the trustee to invoke privilege. The *Riggs* court viewed the source of payment as strong evidence of counsel's role. *See* 355 A.2d at 711. Subsequent authorities have de-emphasized the source of payment. *See*

17

*Restatement (Third) of Trusts* § 82 cmt. f (Am. Law Inst. 2007) (noting that source of payment "is not determinative"). Consistent with that trend, Sections 3333(a) and 3333(b) make clear that the source of payment is not dispositive.

When applying the fiduciary exception, the *Riggs* court also noted the absence of any claim "then pending or threatened" against the trustee. 355 A.2d at 711. Section 3333(a) states that a trustee can retain counsel "whether or not related to any claim that has been or might be asserted against the fiduciary," and Section 3333(b) confirms that the fiduciary may retain counsel in connection with any matter "that is or that might reasonably be believed to be one that will become the subject of or related to a claim . . . ." Sections 3333(a) and 3333(b) thus make clear that a claim need not have been filed or explicitly threatened for the trustee to maintain privilege.

The plain language of Sections 3333(a) and 3333(b) thus does not overrule *Riggs*. The legislative history also does not support such a radical interpretation.

The most prevalent source of legislative history for a Delaware statute is the synopsis, which the Delaware Supreme Court has held is "a proper source for ascertaining legislative intent." *Bd. of Adjustment of Sussex Cty. v. Verleysen*, 36 A.3d 326, 332 (Del. 2012). The synopsis for the 2015 amendment states that it

> revises section 3333 to (1) provide that the attorney-client privilege is deemed to protect communications between a fiduciary and counsel in cases where counsel is retained by the fiduciary and paid by the fiduciary from the fiduciary's own funds, and (2) clarify that the fiduciary exception to the attorney-client privilege does not apply in cases where a fiduciary retains counsel in connection with a claim against the fiduciary or in connection with a matter that might reasonably be believed to be a matter that will lead to such a claim, even if the privileged communications have the effect of guiding the fiduciary in the performance of fiduciary duties.

18

Del. H.B. 164 syn., 148th Gen. Assem. (2015). Nothing in the synopsis speaks of overruling *Riggs* or modifying a long-standing equitable rule.

Rather than overruling *Riggs* and the fiduciary exception, the synopsis recognizes that the fiduciary exception lives on. Item (2) in the synopsis notes that the amendments "*clarify*" when the fiduciary exception "does not apply." *Id.* (emphasis added). The verb "clarify" means to make something clearer or easier to understand.[5] It contemplates preserving the existing rule and confirming its operation. It does not contemplate changing the rule, much less eliminating it.

Overruling *Riggs* by statute would have been a serious matter. In addition to overruling an established line of Delaware authority, the amendment would have rejected an aspect of Delaware Rule of Evidence 502, which cites *Riggs* favorably as a case "illustrating the law covered by this [rule]." D.R.E. 502, cmt.; *see Calloway*, 1996 WL

---

[5] *See Webster's II New College Dictionary* 206 (1999) ("1. To make clear or easier to understand: ELUCIDATE."); *Webster's Ninth New Collegiate Dictionary* 245 (1990) ("2 : to free of confusion 3 : to make understandable"); *Webster's New World Dictionary* 262 (2d coll. ed. 1986) ("2. to make or become easier to understand"); *Webster's Third New International Dictionary* 415 (1976) ("3a: to free (the mind or understanding) of confusion, doubt, or uncertainty . . . b: to explain clearly : make understandable : REVEAL, INTERPRET . . . 4: to make less complex or less ambiguous"); *Clarify*, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/clarify (last visited Dec. 3, 2019) ("to make something clear or easier to understand by giving more details or a simpler explanation"); *Clarify*, Dictionary.com, https://www.dictionary.com/browse/clarify (last visited Dec. 3, 2019) ("1 to make (an idea, statement, etc.) clear or intelligible; to free from ambiguity. . . . 3 to free (the mind, intelligence, etc.) from confusion; revive"); *Clarify*, Merriam-Webster, https://www.merriam-webster.com/dictionary/clarify (last visited Dec. 3, 2019) ("1: to make understandable . . . 2: to free of confusion").

361504, at *1. That step would have had knock-on effects outside of Delaware, because other states regard *Riggs* as the majority rule,[6] and the federal courts apply it as "[t]he leading American case on the fiduciary exception." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 171 (2011). When a statutory amendment intends to overrule a significant Delaware decision, the synopsis often mentions the decision by name. *See, e.g.*, Del. H.B. 19 syn., 145th Gen. Assem. syn. (2009) (amending 8 *Del. C.* § 145 to "adopt[] a default rule different than the approach articulated in *Schoon v. Troy Corp.*, 948 A.2d 1157, 1165–66 (Del. Ch. 2008)"). If the General Assembly had intended to abrogate *Riggs*, doubtless the synopsis would have said so.

### III. CONCLUSION

The motion to compel is granted. J.P. Morgan shall produce in unredacted form the redacted emails submitted in opposition to the motion and previously reviewed *in camera*. J.P. Morgan shall produce all documents on its log dated before November 1, 2016, except for the thirteen items that refer to "potential litigation with Respondent Hadley Fisher." J.P. Morgan shall submit those items for *in camera* review. Compliance shall take place within five days.

---

[6] *See, e.g.*, *In re Kipnis Section 3.4 Tr.*, 329 P.3d 1055, 1062 (Ariz. Ct. App. 2014); *Hoopes v. Carota*, 543 N.E.2d 73, 74 (N.Y. 1989). *See generally* Patricia C. Kussmann, *Construction and Application of the Fiduciary Duty Exception to Attorney-Client Privilege*, 47 A.L.R. 6th 255 (2009 & Supp.). The leading decision that declined to follow *Riggs* recognized that it was adopting a minority view and that "[i]n most of the other jurisdictions in which this question has arisen, courts have given the trustee's reporting duties precedence over the attorney-client privilege." *Wells Fargo Bank v. Superior Court*, 990 P.2d 591, 595 (Cal. 2000).